United States Court of Appeals,

Eleventh Circuit.

No. 96-6213.

Lydia Kay ONISHEA;  Renee Brown;  Carrie White;  Arthur Howard;  Arion Davis, et al., Plaintiffs-Appellants,

v.

Joe S. HOPPER, Commissioner of the Alabama Department of Corrections;  Shirlie Lobmiller, Warden of the Julia Tutwiler Prison for Women;  Steve Dees, Warden of the Limestone Correctional Facility;  Lynn Harrelson, Warden of the Kilby Prison;  Correctional Health Care, Inc., Health care provider of the Alabama Department of Corrections, et al., Defendants-Appellees.

Stewart M. Hughey;  Adam Lamar Robinson;  Chuck Stoudemire, Intervening Defendants-Appellees.

Nov. 4, 1997.

Appeal from the United States District Court for the Middle District of Alabama. (No. CV-87-V-1109-N), Robert E. Varner, Judge.

Before COX, Circuit Judge, KRAVITCH, Senior Circuit Judge, and STAGG[*], Senior District Judge.

KRAVITCH, Senior Circuit Judge:

The Alabama Department of Corrections ("DOC") prohibits inmates who test positive for the Human Immunodeficiency Virus ("HIV") from participating in most of the educational, vocational, rehabilitative, religious, and recreational programs offered in state prisons. The appellant class, which consists of Alabama inmates who are HIV-positive ("HIV+" or "seropositive"), claims that excluding HIV+ prisoners from these programs violates the Rehabilitation Act of 1973 Section 504, 29 U.S.C. § 794 ("section 504" or "the Act"). A prior panel of this court, on an appeal by these appellants from a post-trial dismissal of their class action, remanded the section 504 claim "for additional findings and clarification by the district court." *Harris v. Thigpen,* 941 F.2d 1495, 1528 (11th Cir.1991). On remand, the district court ruled in favor of DOC but failed to comply with the panel's mandate. Accordingly, we again vacate the district court's decision and remand.

---

[*]Honorable Tom Stagg, Senior U.S. District Judge for the Western District of Louisiana, sitting by designation.

I.

Upon entry into the Alabama prison system, each inmate is tested to determine whether he or she carries HIV. The state incarcerates men testing positive at the Limestone Correctional Facility ("Limestone") and women testing positive at the Julia Tutwiler Prison for Women ("Tutwiler"). Each of these prisons houses HIV+ inmates in a separate unit. Seropositive prisoners not only live apart from non-infected inmates, but, in addition, "they have not been able to participate in most of the programs available to general population prisoners, while in other cases, the segregated programming provided to them is not comparable." *Harris,* 941 F.2d at 1521-22.[1]

Carmen Harris filed suit in 1987 and later became the named plaintiff of the class of prisoners seeking declaratory and injunctive relief against DOC. The class claimed that Alabama's HIV policy violated several constitutional provisions and section 504. The district court rejected each of the class' claims. *Harris v. Thigpen,* 727 F.Supp. 1564 (M.D.Ala.1990). The prior panel affirmed the district court's principal constitutional rulings,[2] but vacated its statutory ruling. Noting the absence of any "particularized inquiry" by the district court, the panel established the law of the case by remanding for "full findings of fact and conclusions of law as to each program and activity from which HIV-positive prisoners are being excluded, and a proper weighing of the dangers of transmission in each context." 941 F.2d at 1527.

On remand, appellant Onishea was substituted as named plaintiff for Harris, who died during the litigation. The district court held a lengthy trial and, in an opinion discussing each program from which appellants are excluded, ruled that every program satisfied section 504. *Onishea v. Herring,* No. 87-V1109-N, slip op. (M.D.Ala. Dec. 29, 1995) (hereinafter "Op."). Appellants filed a timely appeal.

---

[1]Specific information regarding the testing and segregation process and the epidemiology of HIV infection can be found in Judge Fay's thoughtful and exhaustive opinion in the prior appeal of this case. We presume familiarity with that opinion.

[2]The class' constitutional claim concerning access to the courts was remanded for additional factual findings and for clarification of the district court's prior order. *Harris,* 941 F.2d at 1528. The district court again denied relief on remand, and that issue has not been appealed.

## II.

Appellants suggest that the district court's opinion contains numerous errors of law and fact that call into question the court's ultimate rejection of their section 504 claim. We discuss the essential statutory elements of a cause of action under the Act and then address the specific challenges to the district court's decision.

### A.

Section 504 states: "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794. Thus, appellants' prima facie case of unlawful discrimination under the Act consists of four elements:

> 1) they are "handicapped" within the meaning of the Act; 2) they are "otherwise qualified"; 3) they are excluded from programs or activities solely because of the handicap; and 4) the programs or activities from which they are excluded are operated by an agency that receives federal financial assistance.

*Harris,* 941 F.2d at 1522. Only one of these elements is in dispute in this appeal—whether appellants are "otherwise qualified." *Id.* at 1522-24 (holding that being HIV+ is a "handicap" and noting that latter two requirements were undisputed).

Deciding whether a person with a contagious disease satisfies the "otherwise qualified" prong of section 504 necessarily begins with *Sch. Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). In *Arline,* the Supreme Court explained that a person is "otherwise qualified" if he "is able to meet all of a program's requirements in spite of his handicap." *Id.* at 287 n. 17, 107 S.Ct. at 1131 n. 17 (quoting *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979)). If the individual has a contagious disease, however, the "otherwise qualified" element requires "the district court ... to conduct an individualized inquiry and make appropriate findings of fact" to determine whether integration would pose "significant health and safety risks." *Id.* at 287, 107 S.Ct. at 1131. The significance of the risk turns on

3

reasonable medical judgments given the state of medical knowledge[ ] about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.

*Id.* at 288, 107 S.Ct. at 1131 (internal quotation omitted).[3] These factors must be balanced; it is more easily justified, for example, for a federal grantee to exclude a person whose terminal illness is transmitted by casual contact than a person who poses little threat of infecting others or who carries a less serious disease.

Even if a plaintiff is not "otherwise qualified" for a program, "refusal to modify an existing program might become unreasonable and discriminatory" under the Act. *Southeastern Community College v. Davis,* 442 U.S. 397, 413, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1979). That is, even though a plaintiff's participation in a federally-funded program poses a significant risk to others, a plaintiff is nevertheless entitled to relief under the Act if reasonable accommodation will render the risk insignificant. *Harris,* 941 F.2d at 1525. A proposed accommodation, however, need not be implemented if it would impose an undue fiscal or administrative burden upon the recipient of federal funds or would require the grantee fundamentally to alter its program. *Alexander v. Choate,* 469 U.S. 287, 299-302, 105 S.Ct. 712, 719-21, 83 L.Ed.2d 661 (1985); *Arline,* 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17. The reasonable accommodation and undue burden inquiries overlap somewhat, and their precise contours are difficult to chart. *See Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 144-48 (2d Cir.1995) (discussing relationship between inquiries). Federal grantees must take modest, but not unreasonable, affirmative steps to ensure that disabled persons have

---

[3]Subsequent to *Arline,* Congress amended the Act to clarify that, in the employment context, a person with a contagious disease could be an "individual with a disability" unless that person, "by reason of such disease or infection, would constitute a direct threat to the health or safety of other individuals or who, by reason of the currently contagious disease or infection, is unable to perform the duties of the job." Civil Rights Restoration Act of 1987, Pub.L. No. 100-259, 102 Stat. 28 (codified at 29 U.S.C. § 706(8)(D)). The intent of this amendment was to codify the *Arline* standard. *See* 134 CONG. REC. S1739 (daily ed. Mar. 2, 1988) (statement of Sen. Harkin) ("[T]he purpose of the amendment was to clarify—and not to modify in any way—the protections of section 504, as they apply to individuals with contagious diseases or infections. The amendment is consistent with the Supreme Court decision in [*Arline* ]."); *see also EEOC v. Amego, Inc.,* 110 F.3d 135, 143 (1st Cir.1997).

access to program benefits. *See Davis,* 442 U.S. at 407-08, 99 S.Ct. at 2367-68 (holding that grantee nursing program not required to provide student with personalized faculty assistance in communicating with patients or exemption from certain required courses as reasonable accommodations); *Tatro v. State of Texas,* 625 F.2d 557 (5th Cir.1980) (grantee school may be required to perform simple, brief medical procedure for student as a reasonable accommodation).

Applying these precepts to the facts of the case at bar, appellants are "otherwise qualified" if they are capable of participating in a prison program notwithstanding their disability and if their participation does not pose a significant risk to other inmates. We assess the significance of the risk by considering the potentially terminal nature of HIV infection, the likelihood that certain behavior will result in HIV transmission, and the frequency of such behavior in prison programs. If appellants are not "otherwise qualified" because they present a significant risk, reasonable accommodations may be available to render such risk insignificant. In prison, such accommodations will involve measures designed to prevent high-risk behavior. A prison grantee, however, is not obliged to undertake those accommodations that prove to be unduly burdensome from an administrative or financial standpoint.

### B.

On remand, the district court found that appellants were not "otherwise qualified" for any of the prison programs from which they have been categorically excluded.[4] It also ruled that the accommodations proposed by appellants either were insufficient to minimize the risk of transmitting HIV or would pose an unreasonable burden on prison administration. Appellants argue that these conclusions were erroneous. Specifically, they claim that the district court: (1) allocated the

---

[4]Appellants challenge their segregation from numerous programs, including religious services, rehabilitation programs (including drug and alcohol abuse classes), prison visitation, vocational classes (ranging from data processing to welding), organized recreational activities, dining hall use, medical clinic visits, out-of-the-prison programs, educational programs (including GED and college courses), a number of prison jobs (such as data entry, errand running, kitchen and laundry jobs, maintenance and housekeeping duty, and work in prison factories), and library use. HIV+ prisoners may participate in some of these activities separately; other programs are unavailable to seropositive inmates.

burdens of persuasion at trial incorrectly; (2) improperly required appellants to disprove every possibility of HIV transmission in a program before finding the inmates "otherwise qualified"; (3) wrongly found that a plaintiff is not "otherwise qualified" if penological concerns justify discrimination; (4) refused to consider probative evidence that certain programs could be integrated safely; (5) misinterpreted the prior panel's opinion by refusing to consider whether certain programs could be integrated at all; and (6) mistakenly concluded that any accommodation imposing additional costs upon DOC would be an undue financial burden.[5]

Appellants' first argument is unpersuasive, but we conclude that their second and third claims are meritorious and require us to vacate the district court's decision. We discuss the remaining claims because they address errors that would likely occasion a third appeal and remand should they be repeated. Claims (1), (2), (3) and (5) are issues of law, which we review *de novo, United States v. Olin Corp.,* 107 F.3d 1506, 1508 (11th Cir.1997); claim (4) challenges the district court's exclusion of evidence, which we review for abuse of discretion, *Judd v. Rodman,* 105 F.3d 1339, 1341 (11th Cir.1997); and claim (6) is an issue of fact, which we review for clear error. *Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096, 1101 (3d Cir.1996).

---

[5]Appellants also contend that the district court misinterpreted the prior panel's opinion by refusing to consider whether *individual* members of the appellant class were "otherwise qualified" or could be made so with reasonable accommodation. They argue that if they can show that one of their number can be integrated safely into a prison program, then the class as a whole is entitled to a declaration that the categorical ban on seropositive inmates' participation in that program violates the Act. This argument is not without appeal, especially in view of section 504's preference for individualized treatment. *See, e.g., Arline,* 480 U.S. at 284, 107 S.Ct. at 1129 ("The fact that some persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding from the coverage of the Act all persons with actual or perceived contagious diseases."). Moreover, common sense tells us that if one class member can establish his or her eligibility for a prison program, then the categorical ban is in tension with section 504's goals. Nevertheless, we conclude that the prior opinion in this case precludes an inquiry that focuses on a particular individual's eligibility for specific programs. The panel directed the district court to determine whether appellants were "otherwise qualified" in light of "the risk of HIV transmission *with regard to each program,*" 941 F.2d at 1526, and "to examine *as to each program* whether "reasonable accommodations' by the DOC could minimize such a risk to an acceptable level." *Id.* at 1527 (emphasis added). Because the prior panel directed the district court to undertake such an inquiry and because a program-level assessment of risk in this case is not plainly inconsistent with section 504, *see Arline,* 480 U.S. at 287, 107 S.Ct. at 1131 (individualized inquiry is necessary "in most cases," but not all), we reject appellants' argument based on the law of the case doctrine.

1.

Appellants argue that circuit precedent places the burden on defendants to prove at trial that plaintiffs are not otherwise qualified or could not be made so with reasonable accommodation, but that the district court erroneously placed that burden on appellants. The district court concluded that the Rehabilitation Act requires plaintiffs to bear the burden of showing that they are qualified to participate in a program or that an accommodation is available that will make them qualified. Although we do not adopt the district court's reasoning,[6] we conclude that it properly allocated the burdens in the present case.

In *Treadwell v. Alexander,* 707 F.2d 473, 475 (11th Cir.1983), we stated that "[o]nce a plaintiff shows an employer denied him employment because of physical condition, the burden of persuasion shifts to the federal employer to show that the criteria used are job related and that [the] plaintiff could not safely and efficiently perform the essentials of the job." We also concluded that a "federal employer has the ultimate burden of persuasion in showing an inability to accommodate." *Id.* at 478.[7] According to appellants, these remarks mean that appellants can carry their trial burden by demonstrating that they would be able to participate in prison programs if they were not HIV+. DOC then would have to prove that appellants' seropositivity poses a significant risk that cannot be accommodated.

Appellants' contention is inconsistent with both our controlling precedent and the prior panel's remand. Recently, we stated unequivocally that a disabled plaintiff must prove that he or she is "otherwise qualified" by showing that he or she is capable of participation in a program, either

---

[6]The district court noted that *Treadwell v. Alexander,* 707 F.2d 473 (11th Cir.1983), and *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112 (11th Cir.1993), "appear[ ] to have placed a more stringent burden upon defendants in a Rehabilitation Act claim," Op. at 20, than did *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), in a Title VII case. Consequently, it refused to follow *Treadwell* and *Fitzpatrick,* even though it thought that they were on point and binding, and even though they came after *Burdine.* This was improper for obvious reasons.

[7]*See also Fitzpatrick,* 2 F.3d at 1127 n. 17 (dicta) (burden of persuasion on reasonable accommodation issue rests with defendant); *Prewitt v. United States Postal Serv.,* 662 F.2d 292, 308 (5th Cir. Unit A Nov.1981) (same).

with or without accommodation. *Holbrook v. City of Alpharetta, Ga.,* 112 F.3d 1522, 1526 (11th Cir.1997). If accommodation is necessary, "[t]he plaintiff retains at all times the burden of persuading the jury that reasonable accommodations were available," and if that burden is met, the defendant "has the burden of persuasion on whether an accommodation would impose an undue hardship." *Id.; see also Moses v. American Nonwovens, Inc.,* 97 F.3d 446, 447 (11th Cir.1996) (same burdens). Likewise, in remanding the instant case, the prior panel held that "in order to obtain relief under section 504 *appellants must establish* that ... they are "otherwise qualified'...." *Harris,* 941 F.2d at 1522 (emphasis added).

*Treadwell* does not command a different result. In that case, this court suggested that a Rehabilitation Act plaintiff need only "com[e] forward with evidence to make at least a facial showing that his handicap can be accommodated" before the burden of persuasion shifts to the defendant. 707 F.2d at 478. The issue the court found dispositive, however, was that the defendant proffered evidence sufficient to show that the proposed accommodation—reassignment of some of the plaintiff's job duties to other workers—would pose an undue burden. *Id.* Consequently, the panel did not have to decide who bore the ultimate burden to show the availability of a reasonable accommodation.

Moreover, *Treadwell* 's dictum is distinguishable; the instant case challenges a federal grantee's practice under section 504, whereas *Treadwell* involved a suit against a federal agency under section 501, 29 U.S.C. § 791(b). Unlike section 504, section 501 requires agencies to undertake affirmative action in favor of disabled people. *See id.* According to the *Treadwell* court, "[t]he necessity for providing reasonable accommodation is derived from" section 501's affirmative action mandate. 707 F.2d at 477-78. In light of this observation and section 501's purpose, which is to make the government a model employer, a proof regime different from section 504 is appropriate. *Cf. Overton v. Reilly,* 977 F.2d 1190, 1194 (7th Cir.1992) (citing *Treadwell* and suggesting that actions pursuant to sections 501 and 504 are identical, with the possible exception

8

of the burden of persuasion on the issue of reasonable accommodation); *Mantolete v. Bolger,* 767 F.2d 1416, 1425 (9th Cir.1985) (Rafeedie, J., concurring) (noting differences between sections).

In sum, we hold that the district court correctly concluded that appellants bear the burden of persuading the finder of fact that they are "otherwise qualified" to participate in prison programs. This burden may be satisfied by showing either that their seropositivity poses no significant risk to others in the program or that reasonable accommodations are available to reduce the risk to an insignificant level. If appellants demonstrate by a preponderance of the evidence that available accommodations would make them "otherwise qualified," then DOC would have to prove that the proposed accommodations pose an undue burden. We realize that "the evidence probative of the issue of whether an accommodation ... is reasonable will often be similar (or identical) to the evidence probative of the issue of whether a resulting hardship ... is undue," *Willis v. Conopco,* 108 F.3d 282, 286 (11th Cir.1997), but note that appellants' burden ordinarily operates at a higher level of generality. That is, appellants will have to show that the suggested accommodation will diminish sufficiently the risk of transmission and is reasonable " "in the run of cases....' " *Id.* at 286 n. 2 (quoting *Barth v. Gelb,* 2 F.3d 1180, 1187 (D.C.Cir.1993), *cert. denied,* 511 U.S. 1030, 114 S.Ct. 1538, 128 L.Ed.2d 190 (1994)). DOC would then be required to demonstrate that the proposed accommodation is unreasonable "in the context of the particular agency's operations." *Id.*

### 2.

People with contagious diseases are "otherwise qualified" if they meet all of the prerequisites for program participation and if their participation would not pose a significant danger. As stated *supra,* whether a person poses a significant threat depends on how the infection is transmitted, how long carriers are contagious, the potential harm to third parties, and the probability that the disease will be transmitted. *Arline,* 480 U.S. at 288, 107 S.Ct. at 1131. The central issue before the district court on remand concerned the fourth factor—the probability of transmission in specific programs. Appellants claim that the district court erroneously applied an unduly exacting standard in ruling that they could not be "otherwise qualified" for a program if there were *any* risk

9

of transmission from HIV+ inmates' participation. We agree that the district court demanded proof beyond that which the Act requires.

In *Arline,* the Supreme Court held that persons with infectious diseases are "otherwise qualified" unless, based upon four factors, their contagion poses "*significant health and safety risks*" to others, 480 U.S. at 287, 107 S.Ct. at 1130 (emphasis added). At the same time, however, a footnote suggested that one of these factors would have determinative weight in certain cases. The Court remarked: "A person who poses a *significant risk of communicating* an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk." *Id.* at 287 n. 16, 107 S.Ct. at 1131 n. 16 (emphasis added). Thus, the Court seemed to distinguish between *significant health risks* and *significant transmission risks* and implied that a less than significant risk of transmission, no matter what the disease, alone could not suffice to justify a person's exclusion from a federally-funded program.

The district court resolved the arguable tension between *Arline* 's significant health risk standard and its significant transmission risk footnote by declaring the latter to be a misstatement. It opined that "[a] strict reading of this could suggest that in analyzing whether reasonable accommodations would render one "otherwise qualified,' the trial court should ignore the remaining *Arline* factors ... and consider only the probability of transmission." Op. at 47. The district court then asked: "May this Court not weigh the catastrophic nature, duration, and severity against a lightweight probability of transmission?" *Id.* In the end, the district court concluded that a small possibility of transmission—but more than a remote theoretical possibility—would suffice to justify exclusion of HIV+ persons from programs receiving federal funds.

This circuit's law is to the contrary. In *Martinez v. School Bd. of Hillsborough County, Fla.,* 861 F.2d 1502 (11th Cir.1988), we held that the district court erred in upholding the exclusion of an HIV+ child from special education classes. The school board argued that the child might transmit HIV to her classmates and teachers through saliva, tears, and excrement. The district court found that a "remote theoretical possibility" of transmission existed in an integrated program and ordered

10

the student segregated. *Id.* at 1506. We rejected the district court's analysis because it required too rigorous a showing; the likelihood of transmission did not "rise to the "significant' risk level that is required" under section 504. *Id.* In announcing this standard, we cited the *Arline* footnote that the district court in the present case declared irrelevant, and we remanded for "findings as to the overall *risk of transmission. ...*" *Id.* (emphasis added).

The district court in this case distinguished *Martinez,* which involved transmission through means that were only theoretically possible (e.g., saliva and tears), from this case, which involves established transmission pathways (e.g., sex and needle sharing). Although correct, this observation does not vitiate *Martinez* 's announcement of a significant transmission risk test in cases involving HIV. Moreover, it ignores the fact that the prior panel hearing this case, citing both *Martinez* and the *Arline* footnote, endorsed the significant risk of transmission standard for this specific set of facts,. *See Harris,* 941 F.2d at 1525 ("If, after reasonable accommodations, a *significant risk of transmission* of the infectious disease still exists, a plaintiff will not be considered "otherwise qualified' ....") (emphasis added).

The district court bolstered its decision to deviate from the significant risk standard by referring to non-circuit precedent, but gave the mistaken impression that courts have uniformly eschewed the significant transmission risk test in HIV cases. We are aware that the Fourth and Fifth Circuits have declared that HIV+ medical workers who pose a less than significant risk of transmitting HIV may, consistent with section 504, be prohibited from performing invasive procedures. *See Doe v. Univ. of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1266 (4th Cir.1995) ("Although there may presently be no documented case of surgeon-to-patient transmission, such transmission clearly is possible."); *Leckelt v. Bd. of Comm'rs,* 909 F.2d 820, 829 (5th Cir.1990) ("Even though the probability that a health care worker will transmit HIV to a patient may be extremely low and can be further minimized through the use of universal precautions, there is no cure for HIV or AIDS at this time, and the potential harm of HIV infection is extremely high."). Other courts, however, have followed closely the Supreme Court's direction in *Arline. See Chalk v. United States Dist.*

11

*Court,* 840 F.2d 701, 707-08 (9th Cir.1988) ("As authoritatively construed by the Supreme Court, section 504 allows the exclusion of an employee only if there is "a significant risk of communicating an infectious disease to others.' " (quoting *Arline,* 480 U.S. at 287 n. 16, 107 S.Ct. at 1131 n. 16)); *New York State Ass'n for Retarded Children, Inc. v. Carey,* 612 F.2d 644, 650 (2d Cir.1979) (applying significant transmission risk standard to hepatitis B, which has identical transmission pathways as HIV, is easier to transmit, but is rarely fatal); *Doe v. Dolton Elementary Sch. Dist. No. 148,* 694 F.Supp. 440, 445-46 (N.D.Ill.1988) (holding that student was likely to prevail and was entitled to injunction where medical evidence showed no significant risk of HIV transmission in school).

Putting previous interpretations of *Arline's* footnote aside, we are convinced that the *Arline* balancing test itself would require a significant risk of HIV transmission before sanctioning segregation. Epidemiologic evidence indicates that transmission of HIV requires intimate, rather than casual, human contact that involves the exchange of certain bodily fluids. *Harris,* 941 F.2d at 1503. At the same time, the record evidence in this case shows that HIV infection is incurable and potentially fatal.[8] *Id.* at 1502-03. Because the *Arline* factors point in different directions, then, determining the overall significance of the risk to third parties depends in large part on assessing the likelihood of behavior that would allow transmission of HIV. We realize that HIV infection frightens most people because of its life-threatening nature. By enacting section 504, however, Congress has directed its grantees to accept some risks and has prohibited them from unduly indulging their fears. *See Abbott v. Bragdon,* 107 F.3d 934, 946-48 (1st Cir.1997) ("[A] service provider like Dr. Bragdon is not entitled to demand absolute safety; he can rely upon the direct threat defense only in response to significant risks.").

---

[8]It was uncontested at trial that the normal progression of HIV infection leads to an AIDS-related death. By the time that the facts of this case are considered anew, that fact may have changed. On remand, we leave it to the district court's discretion how best to discharge its responsibility to assess the dangers of HIV infection "based on reasonable medical judgments *given the state of medical knowledge. ...*" *Arline,* 480 U.S. at 288, 107 S.Ct. at 1131 (internal quotation omitted) (emphasis added).

12

We therefore conclude that the district court erred in holding that a less than significant risk of transmitting HIV justifies appellants' segregation from all programs. Further, a review of the court's decision reveals that this legal conclusion permeated its program-specific findings. Throughout its opinion, the court ruled that appellants were not "otherwise qualified" without any attempt to quantify whether a sufficient risk of transmission existed to warrant categorical exclusion.[9] Because of the number of programs and activities at issue in this appeal, we will not enumerate here each instance in which the district court based its ruling on a less than significant risk of transmission. We offer, instead, three examples that demonstrate the court's failure to quantify and appropriately balance the risks in each prison program.

The district court's consideration of the first program is typical of its approach to many of the challenged activities. Religious programs are held in the Tutwiler chapel, with inmates supervised at all times by the chaplain or his assistants. Appellants argued at trial that the constant supervision would prevent any unsafe behavior, as evidenced by the fact that there had been no incident reports of risky activity during chapel services. Further, they claimed that any remaining safety risk could be rendered insignificant by requiring HIV+ inmates to sit apart from general population prisoners. The court concluded that appellants' evidence failed to prove them "otherwise qualified" because the lack of incident reports "does not prove that potentially high risk behavior (e.g., passing needles or syringes) never occurred, only that it has not been discovered." Op. at 62.[10] In addition, the district court opined that appellants' suggested accommodations did not aid their case; the separate sitting arrangements do not guarantee that high-risk behavior will not occur, the

---

[9]We are aware that the district court occasionally used the correct legal terminology, but we attach no importance to its choice of words because it is apparent that the court would find a "significant" risk even where it conceded none existed. *Compare* Op. at 155 ("this Court holds that integrating the out-of-the-prison programs would present a significant risk of transmitting the deadly HIV virus"), *with id.* at 152 ("The probability that the HIV disease will be transmitted is not significant in the [out-of-the-prison] programs where inmates are supervised by correctional officers....").

[10]The court repeated this reasoning in its analysis of 27 of 79 programs it considered at Limestone and Tutwiler.

13

district court reasoned, because the civilian supervisors have no authority to discipline prisoners if they do not remain separate. *Id.* at 68.[11] These observations, however, rested on conjecture. First, the court assumed that inmates in the programs would possess needles or syringes. Second, it assumed that exchanges of such contraband occur but previously have been undetected. Third, it assumed that inmates would not obey the dictates of their civilian supervisors, even though civilian personnel are instructed to report disciplinary incidents to prison officials. Notably absent was any attempt to determine whether or how often inmates have secreted contraband into prison programs, whether or how often such contraband is able to be exchanged, and whether or how often such exchanges lead to high-risk activity. The district court created a scenario for transmission sufficient to satisfy an "any risk" standard by stringing its assumptions together, but failed to show that the scenario satisfies the governing significant transmission risk test.

Similarly, the district court held that DOC's exclusion of HIV+ inmates from maintenance jobs at Tutwiler was justified. Although the prisoners are not supervised constantly, appellants argued that the prison job board only allows those inmates with appropriate behavioral histories to participate, thus minimizing the risk of high-risk behavior and, consequently, transmission. The district court held that appellants are not "otherwise qualified" because "[t]he risk of the job board's making an erroneous decision always exists," Op. at 211,[12] and because even careful selection of inmates who do not misbehave would not prevent potentially HIV-transmitting fights between seropositive participants and others who oppose integration. *Id.* at 217.[13] Again, the result reached by the court reveals the difference between an "any risk" standard and a "significant risk" standard. The court merely speculated about the job board's fallibility without discussing the potential

---

[11]This rationale appeared 23 times in the opinion.

[12]The court discussed and dismissed the job board on twelve separate occasions in its opinion.

[13]The court justified segregation based on the possibility of HIV transmission from fighting in sixteen different programs.

14

frequency of such errors[14] and assumed that inmate violence was likely to occur in the program. Moreover, although the district court conceded earlier in its opinion that the transmission risk from violence is low, it nevertheless found appellants ineligible to participate. The district court's combination of these factors may identify a conceivable pathway for transmission, but it does not amount to the quantitative analysis necessary to find a significant risk.

The district court's willingness to hypothesize is best exemplified by its treatment of certain out-of-the-prison programs.[15] Although inmates are supervised by corrections officers during such programs and although the court conceded that "[t]he probability that the HIV disease will be transmitted is not significant" in supervised programs, Op. at 152, the court nevertheless rejected appellants' claims that they were "otherwise qualified." The court reasoned:

> [I]n the prison system, one must always be prepared for the unexpected. An automobile or other accident may incapacitate a guard and leave the inmates on the out-of-the-prison detail free to proceed without an escort. An inmate, temporarily healthy but facing the bleak future of all sero-positives, may have controlling impulses vastly different from those of healthy inmates who may be more concerned about the penal aspects of their future.
>
> ....
>
> If ... a correctional officer has been incapacitated in an accident, a female inmate with contempt for that officer could purposely implant, while the guard remains unconscious, blood containing HIV organisms from the HIV+ inmate[']s open wounds.

Op. at 153.[16] Thus, the court found segregation justified even though the likelihood of transmission in these programs depends, in this rather fanciful hypothetical situation, upon the unlikely coincidence of possibilities that an accident might occur, a guard might be wounded and rendered unconscious, and an HIV+ inmate might have both an open wound and a vendetta. It is exactly this

---

[14]The court's speculation is especially inappropriate after it excluded evidence of the job board's effectiveness. *See infra* section II.B.4.

[15]Such programs include, for example, the Medium Custody Road Squad, in which inmates are supervised while cutting grass and picking up trash alongside roadways by an armed guard.

[16]The court used this identical reasoning to reject integration in 6 separate programs.

kind of speculation that the significant transmission risk test guards against and that section 504 prohibits.[17]

These examples are by no means exhaustive and should not be read to suggest that proper application of the appropriate standard will necessitate seropositive inmates' participation in all (or even the preceding) programs. To the contrary, the court may find, upon appropriately quantifying the risk inherent in certain activities, that integration is inappropriate. Appellants candidly admit, for instance, that HIV+ prisoners might properly be excluded from "runner jobs," in which inmates perform errands for DOC personnel and have tremendous access to various parts of the prison, often without supervision. Appellants' Reply Br. at 12. We only hold that the district court erroneously required appellants to disprove all conceivable (and even fanciful) risks of transmission, and that this ruling requires remand for application of the proper standard.

3.

Our conclusion that the district court imposed too strict a burden on appellants does not end this case. Instead, we must address the court's alternative ruling that prisoners invoking section 504 must clear a hurdle that non-inmate plaintiffs need not. Specifically, the court held that inmates' statutory rights under the Act may be subordinated to correctional concerns, just as some of their constitutional rights may be.[18] Under *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96

---

[17]Indeed, we submit that the district court's guesswork in these programs would fail even its own test, which prohibits segregation based on a theoretical risk of transmission.

[18]The dissent, although conceding that the Act applies to state prisons as the law of the case, suggests that "the issue may merit en banc attention." Because the law of the case doctrine precludes us from redeciding this issue, we cannot quarrel here with the Fourth Circuit's recent decision in *Amos v. Md. Dep't of Pub. Safety & Correctional Servs.,* --- F.3d ---- (4th Cir.1997), that the Act does not apply to state prisons. We note, however, that DOC has conceded in this litigation that section 504 is a remedy available to state prisoners. *See Harris,* 941 F.2d at 1522. Moreover, other circuits have squarely confronted the issue and held that state prisoners are entitled to protection under the Act. *See Yeskey v. Comm. of Pa. Dep't of Corrections,* 118 F.3d 168, 174 (3d Cir.1997); *Crawford v. Ind. Dep't of Corrections,* 115 F.3d 481, 487 (7th Cir.1997); *Bonner v. Lewis,* 857 F.2d 559, 562 (9th Cir.1988). The only other circuit to hold that the Act does not apply to state prisoners did so in a cursory manner. In *Williams v. Meese,* 926 F.2d 994, 997 (10th Cir.1991), the court held that a *federal* prisoner was not entitled to protection under section 504 because the "Federal Bureau of Prisons does not fit the definition of "programs or activities' governed by that section." In *White v. Colorado,* 82 F.3d 364, 367 (10th

16

L.Ed.2d 64 (1987), "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."[19] The district court held that appellants were not "otherwise qualified" unless they could prove both that they were capable of participating safely in the program ("the *Arline* test," *supra* ) and that their participation would not cause disciplinary problems ("the *Turner* test"). Because the district court found that there was a likelihood of violence whenever HIV+ inmates are mixed with general population prisoners, it concluded that the *Turner* test rendered appellants not "otherwise qualified."[20] This holding is erroneous.

The district court's freedom to determine the applicable "otherwise qualified" standard was constrained by the prior panel's remand. In setting out what appellants had to prove on remand, the prior panel discussed only the *Arline* test. *Harris,* 941 F.2d at 1525-27. Such silence is significant because the court was acutely aware of the *Turner* test. Immediately prior to discussing section 504, the panel rejected appellants' constitutional right to privacy claim under *Turner. Id.* at 1512-21. Crucially, appellants' privacy claim attacked the same condition as their Rehabilitation Act claim—their segregation. If both causes of action were subject to *Turner,* then, the court should have rejected both upon determining that either failed the *Turner* test. Because the prior panel did

---

Cir.1996), the court cited *Williams,* without significant discussion, for the categorical proposition that the Act "does not apply to issues of prison employment."

[19]Under *Turner,* several factors bear on a regulation's validity:

> (a) whether there is a "valid, rational connection" between the regulation and a legitimate government interest put forward to justify it;  (b) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates;  (c) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates and the allocation of prison resources generally;  and (d) whether the regulation represents an "exaggerated response" to prison concerns.

*Harris,* 941 F.2d at 1516.

[20]*Turner* was the sole ground on which the district court rejected appellants' participation in certain programs. *See, e.g.,* Op. at 369-76 (Limestone staff barber jobs). Usually, however, the court cited *Turner* as a justification for segregating HIV+ inmates after having found that they could not satisfy *Arline.*

not, we conclude that it ruled that the *Arline* test, unadorned by *Turner,* was applicable. On remand, that standard was the law of the case.[21]

As the law of the case, the prior holding bound the district court "unless the presentation of new evidence or an intervening change in the controlling law dictate[d] a different result, or the appellate decision [was] clearly erroneous and, if implemented, would work a manifest injustice." *Litman v. Mass. Mut. Life Ins. Co.,* 825 F.2d 1506, 1510 (11th Cir.1987) (en banc), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 652 (1988). Neither circumstance is present in the instant case. Since this court's prior opinion, neither this circuit nor the Supreme Court has suggested, much less held, that the *Turner* test applies to inmates' claims under the Rehabilitation Act.

The panel's refusal in *Harris* to superimpose *Turner* upon section 504 also was not clearly erroneous. Although we are aware that two of our sister circuits have stated that Rehabilitation Act claims ought to be subject to the *Turner* test, *Torcasio v. Murray,* 57 F.3d 1340, 1355-56 (4th Cir.1995) (dicta), *cert. denied,* --- U.S. ----, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996); *Gates v. Rowland,* 39 F.3d 1439, 1447 (9th Cir.1994),[22] there are several reasons why the *Harris* panel's approach makes better sense. First, although *Turner* serves to restrain the judiciary from interfering

---

[21]The district court suggested that this court's prior opinion inserted the *Turner* test *sub silentio,* citing two occasions where the court referred to the interests of prison officials. *See Harris,* 941 F.2d at 1522 n. 41 (noting the "congruence of the Act's goals with those of prison officials"); *id.* at 1527 (noting that the Act balances rights of disabled inmates against "the legitimate concerns of the prison-grantee"). Neither of these statements suggests that the *Turner* test applies, nor are they inconsistent with applying section 504's test alone; consideration of prison needs is appropriate within the statutory framework because the Act's reasonable accommodation and undue burden inquiries are always contextual. In *Crawford v. Ind. Dep't of Corrections,* 115 F.3d 481, 487 (7th Cir.1997), for example, the court cited *Turner* and noted that "[t]erms like "reasonable' and "undue' are relative to circumstances, and the circumstances of a prison are different from those of a school, an office, or a factory, as the Supreme Court has emphasized in the parallel setting of prisoners' constitutional rights." The court did not, however, hold that *Turner* might render lawful an otherwise clear case of disability discrimination.

[22]The Third Circuit has "flagged" this issue, but has not yet determined whether *Turner* applies to claims under section 504 or the ADA. *Yeskey v. Commonwealth of Pa. Dep't of Corrections,* 118 F.3d 168, 175 (3d Cir.1997).

in prison matters, a job best left to the legislative and administrative branches,[23] 482 U.S. at 84-85, 107 S.Ct at 2259, rights under the Rehabilitation Act emanate from those branches, and thus ought not be subject to *Turner*'s requirements without a congressional indication to that effect. *Cf. Arline v. Sch. Bd. of Nassau County,* 772 F.2d 759, 762 n. 8 (11th Cir.1985) ("We would be acting beyond our authority to read into section 504 limitations which Congress chose not to establish when it clearly could have done so."), *aff'd,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). Second, the *Turner* test is in some ways duplicative of the inquiry under the Act. Applied in the prison setting, section 504's reasonable accommodation and undue burden inquiries, like *Turner's* inquiry, consider the practicalities of accommodating individual rights within established programs and do not require integration where it would pose serious problems that cannot be eliminated consistent with effective and efficient prison administration. The Act thus mandates judicial consideration of interests particular to the prison system. Finally, it has not been this court's practice to subject prisoners' statutory claims to the *Turner* test. *See, e.g., Gambetta v. Prison Rehabilitative Indus. & Diversified Enters., Inc.,* 112 F.3d 1119, 1123 n. 4 (11th Cir.1997) (holding that prisoners not categorically excluded from protection of Fair Labor Standards Act; rejecting blanket exemption from statute where program in question serves rehabilitative purpose); *Lawson v. Singletary,* 85 F.3d 502, 508-11 (11th Cir.1996) (holding that prisoners covered by Religious Freedom Restoration Act to extent intended by Congress).[24]

---

[23]Of course, *Turner* also serves federalism concerns by keeping federal authority out of state prison management unless it is clear that Congress intended such an intrusion. *See Torcasio,* 57 F.3d at 1345. This reasoning, however, does not justify subjecting the Rehabilitation Act to *Turner*'s limits because we already have decided that the Rehabilitation Act applies to state prisons. *See Harris,* 941 F.2d at 1522 n. 41; *supra* note 18. The dissent takes us to task for "second-guessing the legitimate penological decisions of state authorities." Because such review of DOC's decisions has been legislatively mandated (or, to use the dissent's more innocuous phrase, "statutorily prompted") by section 504, however, our inquiry here does not "run[ ] squarely counter to the most basic notions of comity," but rather fulfills the role Congress has created for the courts.

[24]The court in *Lawson* actually subjected the inmates' claim to the *Turner* test, but only because it determined that Congress so intended. The opinion clearly indicates, however, that Congress' intent, and not the simple fact of incarceration, determines the scope of inmates' statutory rights.

19

Thus, the district court erred by grafting *Turner's* constitutional standard onto this court's stated statutory test. We therefore hold that the district court's judgment cannot be affirmed based upon its alternative *Turner* rationale.

4.

Appellants next assert that the district court prohibited them from proving that a reasonable accommodation exists that would make them "otherwise qualified." Specifically, they object to the court's exclusion of evidence of DOC's ability to conduct, as a precondition to program participation, an individualized assessment of seropositive inmates' propensities to engage in high-risk activities. We conclude that the district court erred.

On several occasions during trial, appellants sought to introduce evidence about the prison classification process, but the district court prohibited them from doing so. For instance, appellants attempted to elicit testimony explaining Limestone's and Tutwiler's "job boards" and "classification teams," which together gather psychological, penological, and behavioral data about all inmates and consider such information in making program recommendations and assignments. The district court ruled that, because this case was remanded for a program-by-program assessment of risk, *see supra* note 5, it was precluded from considering evidence about DOC's ability to make, within programs, inmate-by-inmate determinations of eligibility. The district court therefore assumed that DOC's capacity to select inmates who do not pose a significant risk of transmitting HIV was not relevant to the case on remand.

To the contrary, appellants' proffered evidence was central to the question before the district court. One of the things that appellants were required to prove on remand was that, if they could not participate in prison programs safely under current conditions, there existed reasonable accommodations that would allow seropositive prisoners to be integrated safely. A mechanism whereby those least likely to engage in high-risk behavior would be selected for a program may be an accommodation that could reduce the risk of transmission to an insignificant level in a particular program. Further, appellants offered to prove that such accommodation was reasonably affordable

20

and administratively feasible, also relevant to the court's reasonable accommodation determination, as DOC already classifies prisoners and recommends them for various programs based upon their individual histories. Thus, the district court abused its discretion in excluding evidence pertinent to a fundamental issue in the case.[25]

We do not lightly upset a district court's order based upon evidentiary error. Rather, "[w]e overturn evidentiary rulings only when the moving party has proved a substantial prejudicial effect." Fed.R.Civ.P. 61; *Judd v. Rodman,* 105 F.3d 1339, 1341 (11th Cir.1997). Here, however, we already have decided that remand is necessary. Further, by negating one of appellants' principal arguments—namely, that they could be accommodated reasonably—the district court's error itself necessitates remand because it calls into question the propriety of the court's judgment on the merits with respect to each program for which appellants suggested individualized assessment as a reasonable accommodation. "Since the district judge's ruling precluded [the plaintiff] from establishing a prima facie claim, it cannot be characterized as harmless error." *Allstate Ins. Co. v. Swann,* 27 F.3d 1539, 1544 (11th Cir.1994).

5.

The prior panel's remand demanded an inquiry into each prison program from which appellants had been excluded. The district court, however, instructed the parties that it would not entertain argument about several programs that are not held on site at Limestone or Tutwiler but that are available to general population inmates from both facilities. Specifically, the court refused to consider appellants' potential integration into work release programs, correctional industries, residential substance abuse programs, a sex offender treatment program, and boot camps.[26]

---

[25]The district court impliedly recognized this error in its opinion by attempting to evaluate individual assessment as a reasonable accommodation. The court then rejected such accommodation based upon the fallibility of the selection process. Its ruling, however, is tainted by the fact that it excluded evidence tending to shed light on the ability of DOC to predict high-risk behavior reliably.

[26]The district court also ruled that it would not consider integrating HIV+ prisoners into general population housing. Appellants objected to that decision, but did not raise it on appeal. We deem the issue abandoned. *See Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1573 n.

21

Appellants contend that these programs fall within the scope of the remand and that it was therefore error to prevent them from proving that they could participate safely.

Appellants' argument is well taken. The prior panel's remand was not so limited; it directed the court to consider "each program and activity from which HIV-positive prisoners are being excluded...." *Harris,* 941 F.2d at 1527. Indeed, the panel even mentioned work release as a program in which appellants have been denied participation. *Id.* at 1522 n. 40. In view of the Rehabilitation Act's expansive definition of "program or activity," *see* 29 U.S.C. § 794(b)(1)(A) (holding that "program or activity" includes "all of the operations" of state agencies and departments receiving federal funds), we agree with appellants that the off-site programs appear to have been a proper subject for retrial.[27] DOC responds that the prior panel ruled that segregated housing did not violate seropositive inmates' right to privacy and, because these off-site programs are residential in nature, impliedly held that such activities fall outside of section 504. This argument proves too much; by finding DOC's practices constitutional, this court did not conclude that they comported with section 504. Otherwise, there would have been no reason for a remand to assess whether program segregation violated the statute.[28]

_____

6 (1989).

[27]*See also* 28 C.F.R. § 42.540 ("program" includes the operations of department of corrections); Nondiscrimination Based on Handicap in Federally Assisted Programs, 45 Fed.Reg. 37,620, 37,630 (1980) (listing corrections agencies obligated to make, including structural modifications to accommodate disabled persons, "jails, prisons, reformatories and training schools, work camps, reception and diagnostic centers, pre-release and work-release facilities, and community-based facilities").

[28]In rejecting appellants' argument, the district court also relied in part on the fact that, under *Meachum v. Fano,* 427 U.S. 215, 224-25, 96 S.Ct. 2532, 2538-39, 49 L.Ed.2d 451 (1976), inmates have no constitutional right to be housed at a specific facility. We have no quarrel with the court's statement, as far as it goes. It is true that, absent some state law entitlement to be housed in a particular place, an inmate does not have an interest protected by procedural due process in avoiding transfer. *See id.; Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). To say this, however, does not absolve prison officials of their responsibility to comply with other substantive guarantees of federal law; just as an equal protection challenge would be proper if prison authorities chose to incarcerate blacks and whites in separate prisons, *see Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968), so, too, is a Rehabilitation Act challenge appropriate where prison authorities choose separate facilities for the disabled.

Our conclusion does not command that these programs be integrated. We express no opinion on that subject, especially given the emptiness of the record regarding such activities. We hold only that the district court must consider whether section 504 mandates integration.

6.

The parties and the district court agree that certain programs could be integrated safely by adding corrections personnel, in some cases a single officer. The district court, however, rejected appellants' argument that DOC should add staff as an accommodation. Because DOC does not receive from the Alabama legislature all of the funds it requests and because its funding had, at the time of trial, recently been reduced, the district court found that the addition of even a single corrections officer to integrate HIV+ inmates into certain programs would impose an undue burden upon DOC. This determination was clearly erroneous.

Appellants carried their burden of showing that hiring an additional officer is financially reasonable " "in the run of cases,' " *Willis v. Conopco,* 108 F.3d 282, 286 n. 2. (11th Cir.1997) (quoting *Barth v. Gelb,* 2 F.3d 1180, 1187 (D.C.Cir.1993)), by demonstrating that a new officer would not occupy an unreasonably large portion of DOC's budget. It is uncontested that DOC's operating budget was $178 million in 1993 and $163 million in 1994. It is also uncontested that the first-year cost of an additional corrections officer is $24,483. Appellants satisfied their burden by citing these stipulated figures. *See United States v. Bd. of Trustees for the Univ. of Ala.,* 908 F.2d 740, 751 (11th Cir.1990) ("In light of UAB's annual transportation budget of $1.2 million, an expenditure of $15,000, plus occasional amounts ..., is not likely to cause an undue burden on UAB.") (citations omitted).

Consequently, to be permitted to segregate HIV+ inmates from a program where a single officer would provide adequate safety, it is DOC's duty to demonstrate that hiring one new officer is unreasonable " "in the context of the particular agency's operations.' " *Willis,* 108 F.3d at 286 n. 2. This DOC has not done. That DOC receives fewer funds than it requests or that it has fewer officers than it would like says nothing about its ability to hire a single officer within its current

23

budget.  Trial evidence indicated that DOC has tremendous spending discretion within its budget and can request necessary additional funds from the legislature.  Additionally, a defense witness conceded that DOC would save money if it were to discontinue some of the "separate but equal" programs currently operated for seropositive prisoners.  Such funds presumably could finance an additional guard to facilitate integration.

We therefore conclude that, based upon the evidence before it, the district court clearly erred in finding that any expenditure by DOC to hire additional staff would be an "undue burden."  We leave open on remand the possibility that sufficient evidence may be adduced as to the unreasonableness of adding even a single guard, but note that DOC must show that such an accommodation would be unreasonable given the demands of its present budget.  *See* 28 C.F.R. § 42.511(c) (stating that undue hardship inquiry should consider "(1) [t]he overall size of the recipient's program with respect to number of employees, number and type of facilities, and size of budget;  (2)[t]he type of the recipient's operation, including the composition and structure of the recipient's workforce;  and (3)[t]he nature and cost of the accommodation needed").[29]

## C.

To summarize, we hold that the district court correctly allocated the burdens of persuasion at trial.  We vacate the judgment of the district court and remand for further proceedings, however, because the district court determined that appellants were not "otherwise qualified" based upon two errors of law:  (1) the court required appellants to disprove all conceivable risks of transmission in prison programs, even though the statute requires only the elimination of significant risks;  and (2) the court disqualified appellants from programs in which penological interests, such as eliminating completely the potential for inmate violence, purportedly justified segregation.  On remand, the district court must reassess whether appellants are "otherwise qualified" in light of our decision.  Moreover, the court should consider evidence that demonstrates DOC's ability to integrate programs

---

[29]Although this provision is located in a section of the Department of Justice's Rehabilitation Act regulations titled "Employment", the first and third factors it suggests are equally relevant to evaluating whether an accommodation would be an undue burden in a non-employment case.

24

by selecting only those individuals unlikely to engage in high-risk behavior. The court also must examine the possibility of integrating the off-site programs discussed in section II.B.5. Finally, the court should not find that DOC has satisfied its burden of proving that suggested accommodations are unreasonable simply upon a showing that DOC receives less than its requested level of funding from the state or upon a showing that DOC has fewer officers than it would like.[30]

III.

Near the beginning of trial on remand, appellants moved to recuse Judge Varner from hearing the case. They appeal the district court's denial of that motion, claiming that recusal was required because the son of DOC's lead counsel is Judge Varner's law clerk and because Judge Varner revealed that he discussed the case with his son, a doctor, who expressed his view that there was a risk of HIV transmission in some of the programs at issue on retrial. We review the judge's recusal ruling for an abuse of discretion. *Loranger v. Stierheim,* 10 F.3d 776 (11th Cir.1994). On appeal, appellants forward an additional ground for disqualification; they claim that the judge's trial comments evinced a pervasive hostility toward the members of the appellant class. We are concerned by the allegation that the judge and his son discussed disputed matters, but avoid deciding whether recusal was necessary. The remaining allegations are not disqualifying.

The relevant provisions of the recusal statute read as follows:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

---

[30]We do not reach several issues argued on appeal. First, DOC contends that it may face liability in suits by prisoners and the public if programs are integrated and innocents are infected. Second, appellants challenge several of the district court's factual findings, including its reliance on the "Ingram Study," an inmate opinion survey purporting to show an increased likelihood of violence after integration, and its conclusion that certain behavior (sex between women,, sports, fighting, and sharing barbering equipment) posed a high risk of HIV transmission. Third, DOC suggests that the Prison Litigation Reform Act, 18 U.S.C. § 3626, limits appellants' ability to secure sweeping injunctive relief. On remand, the district court is free to examine these issues' bearing on the merits of appellants' claims and, if appropriate, on the necessity and scope of relief.

25

> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding....

28 U.S.C. § 455. Appellants argue that Judge Varner's trial comments and the hiring of DOC's counsel's son create a reasonable question about the judge's partiality under section 455(a) and that Judge Varner's discussion with his son gave him knowledge of disputed facts in violation of section 455(b)(1). In the alternative, appellants claim that all of these facts considered together would lead a reasonable person to question the judge's impartiality. *See Parker v. Connors Steel Co.,* 855 F.2d 1510, 1525-26 (11th Cir.1988), *cert. denied,* 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989) (adopting totality of the circumstances approach in evaluating allegations under section 455(a)).

At trial, Judge Varner made a number of comments that appellants claim demonstrate his bias against inmates with HIV. The parties agree that the judge's bias, if any, did not stem from an extrajudicial source. As such, recusal under section 455(a) is only required if the comments reveal an antipathy for appellants intense enough to make fair judgment impossible. *Liteky v. United States,* 510 U.S. 540, 554-56, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994).

We conclude that the judge's trial statements do not indicate a bias so severe as to call into question the fairness of the trial. The court opined on numerous occasions that inmates are unpredictable and untrustworthy, and it also pressed DOC's counsel to elicit trial testimony about the horrors of dying from AIDS. The former statement is perhaps an unfair generalization insofar as it applies to certain members of the appellant class, but it is not proof of severe prejudice. *See id.* (referring, as example of disqualifying bias, to case where district court allegedly professed difficulty in objectivity toward German-Americans because their " "hearts are reeking with disloyalty' ") (quoting *Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921)). The latter statement is unobjectionable; the court requested evidence on the amount of suffering involved in advanced cases of HIV infection because it believed such information was part of the legal test that it had to apply.[31]

---

[31]*Arline* 's fourth factor is "the probabilities the disease will be transmitted and will cause varying degrees of harm." 480 U.S. at 288, 107 S.Ct. at 1131 (quotation omitted). In chambers,

Appellants also allege that Judge Varner was obligated to recuse himself under section 455(a) because the fact that his law clerk's father was lead counsel for DOC creates a reasonable question about the judge's impartiality. It is true that a law clerk's involvement in a case and his or her relationship to one of the parties may constitute grounds for the judge's disqualification. *See, e.g., Parker,* 855 F.2d at 1524-25 (recusal was required where judge's clerk was son of senior partner in firm representing party, the father was himself a former law clerk to the judge, the son held a hearing with the parties present but not the judge, and the judge thanked the law clerk in his order for the clerk's extensive work on the case).

Law clerk conflicts, however, are not necessarily judicial conflicts, and we conclude that Judge Varner did not abuse his discretion in denying disqualification on this ground. The court stated unequivocally in its order that the clerk had no involvement in this case, and the clerk's father submitted an affidavit representing that he instructed his son not to take any action with regard to the suit. These averments satisfy us that disqualification was not required. *See Parker,* 855 F.2d at 1525 (recusal "might have been avoided if [the judge] would have taken steps to isolate [the clerk] from this case"); *Hunt v. American Bank & Trust Co.,* 783 F.2d 1011, 1015-16 (11th Cir.1986) ("If a clerk has a possible conflict of interest, it is the clerk, not the judge, who must be disqualified.").

As a final basis for disqualification, appellants allege that, during an in-chambers status conference, Judge Varner revealed that he had discussed disputed material issues with his son. Counsel for appellants testified that "Judge Varner stated that he had spoken with his son, who is a doctor, about transmission of the virus and that his son had told him that there was a risk of transmission in some of the contexts subject to retrial on remand." Affidavit of Margaret Winter, Sept. 6, 1994, at 1-2. DOC's counsel rejoined that "Judge Varner did not make any statement closely resembling" appellants' account. Affidavit of David Byrne, Jr., Sept. 8, 1994, at 2. DOC contends

---

the court merely inquired about the phrase "will cause varying degrees of harm." We do not necessarily agree with the court's view of this snippet of *Arline* (as the balancing test already accounts for "the severity of the risk"), but appellants unfairly take the court's legal inquiry out of context.

that the discussion in chambers concerned the issue of how HIV can be transmitted, that Judge Varner expressed his view that the medical community was divided on the issue, and that Judge Varner also mentioned his son's illegible handwriting, but that the latter statement was unconnected to the prior discussion about issues for trial. *Id.* For his part, Judge Varner did not deny that the conversation took place, nor did he dispute appellants' characterization of the substance of the discussion. Instead, the court held that the conversation could not form the basis for recusal because of the court's conclusion that the reported statements were not disputed in the case; the court then quoted portions of this court's prior opinion acknowledging that the risk of HIV transmission exists in prisons generally. Opinion of Sept. 19, 1994, at 11-12.

Extrajudicial fact-finding by a judge is improper because it cannot be "tested by the tools of the adversary process." *Edgar v. K.L.,* 93 F.3d 256, 259 (7th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 949, 136 L.Ed.2d 837 (1997). That is, " "a judge cannot be, or cannot appear to be, impartial if he has personal knowledge of evidentiary facts that are in dispute.' " *United States v. Alabama,* 828 F.2d 1532, 1545 (11th Cir.1987), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988) (quoting Thode, Reporter's Notes to Code of Judicial Conduct 62 (1973)). Consequently, section 455(b)(1) creates a self-enforcing duty to recuse if a judge, outside of his or her judicial capacity, gains knowledge of facts material to the case. *Id.*

Whether section 455(b)(1) mandated disqualification is a difficult question based upon the record before us. We cannot tell from the parties' representations or the court's order what information Judge Varner's doctor-son may have conveyed to him. It is unclear, for instance, what appellants' counsel meant by the phrase "some of the contexts subject to retrial on remand." Consequently, we are unable to assess whether the conversation covered the risks of transmission in prison programs, an issue that is both material to the case and in dispute. Given these circumstances, we could remand for a hearing into the nature of the alleged conversation, *see Easley v. University of Mich. Bd. of Regents,* 853 F.2d 1351, 1358 (6th Cir.1988), so that we might better assess whether disqualification was necessary, but we do not do so here. We think it wise to reserve

judgment on whether or not Judge Varner's conversation with his son required recusal under section 455(b)(1). Likewise, we decline appellants' invitation to find Judge Varner's conduct inappropriate under section 455(a)'s more general proscription against partiality.

Instead, we invoke this court's supervisory authority over the courts of this circuit and chart a middle course. Because we are remanding this case for further proceedings, reassignment to a different judge is an option pursuant to 28 U.S.C. § 2106, which permits courts of appeals to "require such further proceedings to be had as may be just under the circumstances." In deciding whether to reassign, we consider whether the district judge would have difficulty putting his or her previous views and feelings about a case aside on remand, whether assignment to a new judge is appropriate to preserve the appearance of justice, and whether reassignment will create such waste and duplication as to outweigh its benefits. *Chudasama v. Mazda Motor Corp.,* 123 F.3d 1353 (11th Cir.1997); *United States v. Remillong,* 55 F.3d 572, 577-78 n. 12 (11th Cir.1995).

Even a cursory review of the district court's order reveals Judge Varner's unwillingness to put aside the conclusions he reached after the first trial. In response to the district court's blanket conclusion after the original trial that appellants were not "otherwise qualified" because high-risk behavior occurs in prisons, the prior panel directed the district court to examine each challenged program, stating that "general findings and prison policy" could not justify segregation. *Harris,* 941 F.2d at 1527. Nevertheless, on remand, the district court relied heavily on generalization and deference to prison policy in rejecting appellants' claims. In each program for which the court determined that appellants were not "otherwise qualified," it found that high-risk behavior and violence against seropositive inmates were likely because they occur in prisons generally.[32] Further,

---

[32]Specifically, the district court selected segments of this court's prior opinion—wherein the panel observed that "the elimination of high risk behavior ... is impossible," *id.* at 1520, and that total integration of the prison "could likely degenerate into active violence," *id.* at 1518—and then stated that there is no reason to believe that these general observations about prison are not also true of specific programs. The court repeated these end-runs around the prior panel's remand in discussing no less than 39 of 43 programs at Tutwiler.

the court gave unbridled deference to the decisions of prison officials, repeating the following statement either verbatim or in substance in its analysis of nearly every challenged program:

> This Court is ill-suited to instruct prison officials on the likelihood of the occurrence of high risk behavior. This Court is even more ill-suited to instruct the prison system on when and how to prevent such conduct when they [sic], along with their managers and medical officials, determine that such conduct is likely. Because Defendant/Prison system has decided that such conduct is likely, and because of the catastrophic severity of the consequences if such conduct does occur, this Court holds that integrating [the specific program] would present a significant risk of transmitting the deadly HIV virus.

Op. at 63; *see also passim.* The district court's deference to policy makers, however, led it to abandon its judicial role. *See, e.g., id.* at 461 ("*Regardless of how much evidence is presented,* no court will ever be as qualified as prison officials to judge the particular needs of a penal institution.") (emphasis added).[33]

Reassignment is also necessary to preserve the appearance of justice. First, we believe that reasonable people would be troubled by the judge's alleged conversation with his doctor-son about the case and about disputed evidence in addition to the court's unwillingness to forego generalizations about prison in analyzing particular programs. Although we lack sufficient evidence to conclude that the discussion mandated recusal, we are convinced that the situation is questionable enough to warrant reassignment. Second, the court brushed aside both precedent, *see supra* note 6, as well as the prior panel's remand, *see supra* sections II.B.3. & 5, to rule against appellants. Finally, appellants' other grounds for disqualification, although alone insufficient to mandate recusal, add to the totality of the circumstances and increase the appearance of injustice.

We are not unmindful that this case is substantial, having spawned a voluminous record and having been litigated for nearly ten years. At the same time, however, we note that the first appeal of this case disposed of all but one of appellants' constitutional claims, and appellants have not now appealed the second denial of the remaining claim. Thus, the only issue left is the program-by-program analysis under section 504. This will surely involve additional fact finding,

---

[33]The court also imposed the *Turner* test upon appellants' prima facie case, thereby giving prison officials added deference. *See supra* section II.B.3.

but we are convinced that this additional burden is outweighed by the needs of justice and by Congress' broad mandate that "[n]o otherwise qualified handicapped individual ... shall, solely by reason of his handicap, ... be subjected to discrimination under any program or activity receiving Federal financial assistance...." 28 U.S.C. § 794.

IV.

Accordingly, the decision of the district court is VACATED. We REMAND for further proceedings consistent with this opinion and with the direction to the Chief Judge of the Middle District of Alabama that the case be REASSIGNED to a different district judge for further proceedings.

COX, Circuit Judge, concurring in part and dissenting in part:

I respectfully disagree with the majority's resolution of five of the issues addressed in its opinion. First, § 504 of the Rehabilitation Act of 1973 does not require federal-fund grantees and their wards to live with even slight odds of contracting a painful and fatal disease. Second, prisoners' rights under the Rehabilitation Act, like their constitutional rights, are properly limited by legitimate penological concerns such as security. Third, the district court correctly concluded that providing the additional security necessary to integrate the plaintiffs in all the programs at issue here would be an undue burden on the Department of Corrections. Fourth, the district court should not be mandated to consider programs requiring residential integration when—as the majority found—the plaintiffs have waived the argument that the district court should have addressed their rights to residential integration. I would accordingly find no error in the district court's treatment of these issues. Finally, this action does not merit the extreme measure of reassignment to another district judge. I agree, however, with the majority's holding that the district court's exclusion of evidence of prisoner classification as a reasonable accommodation requires remand.[1] Thus, I would vacate the judgment and remand solely for the district court to reconsider whether inmate-specific

---

[1]See part II.B.4 of the majority opinion.

31

risk evaluation is a reasonable accommodation in light of the excluded evidence concerning inmate classification.

## I. Background

This litigation began ten years ago in reaction to a legislatively mandated AIDS-protection program in Alabama's prison system. Under statute,[2] the Alabama prison system tests all entering inmates for infection with the Human Immunodeficiency Virus, which causes AIDS.[3] Those inmates testing positive for the virus are segregated from the general inmate population in "HIV+" units, one for men at the Limestone Correctional Facility and one for women at the Julia Tutwiler Prison for Women.[4] So segregated, the HIV-positive inmates are unable to participate in many programs and activities with the HIV-negative, general population.[5]

The plaintiff class challenged this practice as a violation of several constitutional rights and of § 504 of the Rehabilitation Act of 1973.[6] The district court denied relief after a bench trial. The court concluded that no constitutional rights were violated. It further concluded that the plaintiffs were not "otherwise qualified," as required for rights to arise under § 504, to participate in integrated programs because their participation would pose a significant HIV-transmission risk. This court affirmed judgment against the plaintiffs on the constitutional claims. This court held, however, that § 504 requires a program-by-program analysis to determine if the plaintiffs merit relief.[7] The action was remanded to the district court for this fact-finding. This court directed the district court especially to evaluate the risk of HIV transmission in each program. In doing so, the panel

---

[2]Ala.Code § 22-11A-17(a) (1996 Supp.)

[3]*Harris v. Thigpen*, 941 F.2d 1495, 1499 (11th Cir.1991).

[4]*Id.* at 1500.

[5]*Id.*

[6]Codified as amended at 29 U.S.C. § 794 (1994).

[7]*Harris,* 941 F.2d at 1523.

32

nonetheless acknowledged that "the court's conclusion of the significance of the risk of HIV transmission with regard to each program [could] be unaltered."[8]

The remaining factual dispute at the trial that followed remand (and on this appeal) is narrow. Several key facts are undisputed. In the current state of medical knowledge and art, HIV infection inevitably progresses to AIDS. AIDS always leads to death, often after lengthy suffering. There is likewise no dispute that HIV is transmitted through body fluids, and that transmission by blood is much more probable than transmission by any other means. The primary disputed issue is the likelihood of blood-to-blood contact between HIV-positive and HIV-negative inmates during the various programs in which the plaintiffs seek to participate.

The defendants presented evidence that transmission is possible in any integrated activity. They did this in two ways. First, the defendants showed that certain activities inherently raise the possibility of blood transmission.[9] Second, the defendants adduced evidence that high-risk behavior (such as anal intercourse, sharing of drug needles,[10] or tattooing[11]) or behavior that presents the possibility of transmission (such as violent bloodshed) may occur in virtually any activity in which HIV-positive and HIV-negative prisoners mingle without supervision.[12] This evidence included testimony about and numerous incident reports of high-risk behavior in a variety of settings, from

_____

[8]*Id.* at 1526.

[9]*See, e.g., Onishea v. Herring*, No. 87V-1109-N, at 31 (M.D.Ala. Dec. 29, 1995) [hereinafter Op.]; R.29 at 158 (barbering with unsterilized razors); Op. at 32; R.29 at 167 (sports).

[10]The parties agreed that anal intercourse and sharing hypodermic needles are high-risk behaviors. Op. at 27.

[11]R.29 at 32.

[12]*See, e.g.,* R.29 at 145-46 ("possibility" exists during anger-management and substance-abuse therapy for both violent and needle-sharing behavior); *id.* at 179 ("opportunity" exists during data processing classes at Tutwiler for needle-sharing); *id.* at 177-78 (large size of class and individual attention makes high-risk behavior possible in cosmetology class at Tutwiler).

33

bathrooms to the kitchen to the library.[13] Defense witnesses provided anecdotal evidence that even prisoners with strong incentives to behave have nonetheless run risks.[14] The defense case also contained evidence that HIV-negative prisoners will not easily tolerate integration. This evidence included a 1988 study of Alabama prisoners concluding that HIV-negative inmates may react violently to integration[15] and corroborating anecdotal evidence.[16] Finally, the defendants presented circumstantial evidence that Alabama's total segregation policy, one of only two in the nation, is superior to integrated programs in slowing HIV's spread. The all-time seroconversion rate per thousand prisoners in Alabama's prisons is .00006%, as compared to annual rates of .19, .33, and .41% in Nevada, Illinois, and Maryland, respectively, all states with integrated populations.[17]

The plaintiffs naturally took a different tack. While never categorically denying the *possibility* of transmission if a bloody fight breaks out, tattoo needles are shared, sports injuries occur, or female inmates have sex with each other, they marshaled evidence of the rarity or absence of any such incidents of transmission.[18] They further presented evidence that there are no reported or witnessed incidents of anal sex, needle-sharing, or other high-risk behavior during any of the activities in which they wish to participate.[19] The plaintiffs also offered evidence that the degree of

---

[13]*See, e.g.,* R.32 at 191 (syringes smuggled into Limestone wrapped in Kotex pads); Defs.' Exs. F-5 (needles hidden in library), F-7 (syringe in public bathroom), F-20 (unspecified homosexual act in kitchen over a mixing bowl of peanut butter and jelly).

[14]*See* R.32 at 295 (runner—who as such held a coveted job among the prisoners—engaged in high-risk behavior in the HIV unit at Limestone).

[15]*See* R.36 at 142-43.

[16]For instance, HIV-negative prisoners refused to use the same drafting tools as the HIV-positive inmates, for fear of contracting HIV. R.27 at 228.

[17]Op. at 462.

[18]*See, e.g.,* R.27 at 35 (no documented cases of transmission through stabbing); *id.* at 43-44 (never a reported incident of transmission via tattoo needles); *id.* at 36-39 (no confirmed cases of sports-related transmission); *id.* at 18 (only theoretical cases of sexual transmission between women have been described).

[19]*See, e.g.,* R.25 at 76-77 (no sex or needle-sharing incidents reported in cosmetology class, just fistfights); *id.* at 110 (no incidents except fistfights in sewing factory at Tutwiler); R.32 at

34

surveillance in most circumstances makes such behavior implausible. Moreover, the plaintiffs' anecdotal evidence is that HIV-positive and HIV-negative prisoners in both Limestone and Tutwiler have mingled peacefully and without HIV transmission in "welfare committee" meetings,[20] fire drills,[21] "Communicators' Meetings,"[22] and literacy training classes[23].

Based on this record, the parties' approach to measuring the odds of transmission is predictable. On one hand, the defendants contend that transmission *could* happen whenever prisoners mix because of the perpetual potential for high-risk activity or for violence—and the HIV-negative prisoners' anti-HIV sentiments boost the odds of confrontation and bloodshed. HIV-positive participation in any of the programs, according to the defendants, thus poses a significant risk of transmission. On the other hand, the plaintiffs argue that none of the defendants' chthonic scenarios has ever been realized in prison history, and that the defendants' fear of clashes between HIV-positive and HIV-negative inmates is unwarranted in today's enlightened prison society.

The district court generally took the defendants' view, concluding that the risk of transmission in every program was significant. While the court's reasoning was not wholly uniform for every program, the court generally reached this result by measuring the odds based on two background findings, rather than extrapolating past incidents of transmission. The first finding is

_____

258 (no incidents among inmate maintenance workers at Limestone); *id.* at 251 (no incidents among tractor crew at Limestone); *id.* at 247-48 (no incidents on the "double-O squad," which maintains the prison grounds); *id.* at 244 (no incidents in "college by cassette" classes); *id.* at 245 (no disciplinary incidents in the paralegal classes); *id.* at 246-47 (no incidents at GED and college graduation ceremonies); R.25 at 205 (no incidents in substance abuse treatment classes).

[20]R.28 at 94.

[21]R.33 at 26-27.

[22]*Id.* at 28-29. On the other hand, one of the plaintiffs' experts also opined that "there has to be an unlearning process" at both Tutwiler and Limestone, and that certain activities such as dining should therefore not be immediately integrated. *See* R.25 at 93.

[23]R.33 at 210-12.

that sex, intravenous drug use, and bloodshed are a perpetual possibility in prison whenever a security guard trained to stop it is not watching, and that prison life is inherently unpredictable[24]—especially when large-scale mixing of HIV-positive and HIV-negative prisoners in Alabama is untried. The second finding is that HIV is transmitted by sex, intravenous drug use, and blood-to-blood contact. If these activities can spread HIV, and these activities can occur between HIV-positive and HIV-negative inmates, the court reasoned, then HIV transmission is more than a theoretical possibility, even if we have no examples.[25]

From this conclusion, the court easily found this risk to be significant. After all, each case of transmission, however rare, claims at least one life. More lives could follow if the infected general-population inmate spreads the virus to his dormmates. To support this inference of harm, the court pointed to an investigation of a 1991 syphilis outbreak at Limestone in which medical officials located 86 prisoners suspected of sexual contact with a single infected inmate.[26] Given this degree of harm, even slim odds of transmission make the risk significant. As the court put it in words echoed throughout its 475-page opinion, "elimination of high risk behavior is impossible.... Because the Defendant/Prison system has decided that such conduct is likely, and *because of the catastrophic severity of the consequences if such conduct does occur,* this Court holds that integrating the [program under discussion] would present a significant risk of transmitting the deadly HIV virus. Accordingly, the HIV+ inmates are not "otherwise qualified.' "[27]

The court took this otherwise-qualified analysis one step further. As part of its evaluation of the plaintiffs' qualifications to participate in the programs, it weighed the Department of Correction's penological concerns, including the danger of violence that might arise from inmate

---

[24]*See, e.g.,* Op. at 211.

[25]*See id.* at 48.

[26]Op. at 464.

[27]*Id.* at 313-314 (emphasis added); *accord, e.g., id.* at 82, 277-78.

prejudice toward and fear of HIV-positive prisoners.[28] The court looked to *Turner v. Safley,* which permits infringement of prisoners' First Amendment rights provided that the prison regulation "is reasonably related to a legitimate penological interest,"[29] as a guide to evaluating the Department of Corrections's interests. In almost every program, the court concluded that the Department of Corrections could legitimately seek to prevent violence and epidemic HIV by the measures it has taken.

The court continued its analysis, as directed by this court,[30] by asking if reasonable accommodations would make the plaintiffs qualified. Although the court found that in many programs the plaintiffs had already been reasonably accommodated by provision of identical, but segregated programs,[31] the court found as to other programs that the only effective accommodation would be additional guards to prevent high-risk behavior. The court concluded, however, that hiring the dozens of guards necessary to integrate all the programs safely would place an undue financial burden on the Department of Corrections.

The plaintiffs have attacked every step of the analysis. On the "otherwise qualified" issue, they contend that the district court weighed too heavily the gravity of the harm that could result if these small risks are realized, and that the district court improperly took legitimate penological objectives into account. Furthermore, they argue that the district court erroneously considered the burden on the Department of Corrections of accommodating all of the plaintiffs' demands, rather

---

[28]*Id.* at 15-16.

[29]482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).

[30]*Harris v. Thigpen,* 941 F.2d 1495, 1527 (11th Cir.1991).

[31]These activities included those such as visitation, classes, haircuts, medical treatment, sports, and legal research. Op. at 87 (visitation at Tutwiler); *id.* at 326 (paralegal training classes at Limestone); *id.* at. 336 (high-school and college level courses at Limestone); *id.* at 341 (GED examination at Limestone); *id.* at 383 (haircuts at Limestone); *id.* at 407 (visitation at Limestone); *id.* at 415 (medical treatment at Limestone); *id.* at 435 (sports at Limestone); *id.* at 444 (legal research at Limestone). The plaintiffs briefly challenge this conclusion, but the majority does not address it. I would affirm the court's finding that providing materially identical activities in a separate location is a reasonable accommodation of the risks posed by the plaintiffs' contagious disease.

than myopically considering whether hiring the few guards necessary to integrate each program would individually overburden the entire prison system. These arguments present issues of law and mixed issues of law and fact; both are reviewed de novo, although findings of fact stand unless clearly erroneous.[32]

*  *  *

The plaintiffs raise a final issue unrelated to the merits. They argue that Judge Varner should have recused himself from the retrial of this case. Three circumstances, the plaintiffs contend, make recusal mandatory: the judge's alleged consultation with his son (who is a physician) concerning the facts of this case; the father-son relationship between Judge Varner's law clerk (who did not work on this case) and defendants' lead counsel; and finally Judge Varner's asserted bias against the plaintiffs, as evidenced by a few of the Judge's remarks on the record during the trial. Because none of these circumstances warrant recusal, I concur in the majority's conclusion on this issue. I would refuse, however, to undermine that conclusion by reassigning the action based on the very same facts.

## II. Discussion

I break with the majority's analysis of the merits of the claims asserted in this action in three ways.[33] These differences correspond to the three different stages of the district court's analysis: first, its determination that the plaintiffs were not otherwise qualified to participate in the relevant programs; second, the court's inquiry into the effect of legitimate penological interests on the prisoners' Rehabilitation Act rights; and finally its consideration of reasonable accommodations, a step demanded by the finding that the prisoners were not otherwise qualified. The majority holds that the district court applied the wrong standard on the first step, improperly added the second step,

---

[32]*Kennedy v. Herring*, 54 F.3d 678, 682 (11th Cir.1995).

[33]I agree, however, that this court's earlier mandate required the district court to consider evidence relating to inmate classification, as that is probative of potential reasonable accommodations. I would therefore remand for the limited purpose of permitting the district court to revisit its reasonable accommodations analysis in light of that evidence and any counterevidence the defendants may choose to offer.

38

and erroneously found on the last step that the plaintiffs' proposed reasonable accommodations, considered together rather than program by program, are unduly burdensome.

The majority's first holding requires courts to treat all transmissible illnesses equally, regardless of their consequences; this does not comport with the law. The second holding requires courts to apply identical standards to classrooms, workplaces, and prisons, and thus does not observe both the unique importance of security in the prison environment and limited judicial competence in the penal realm. Finally, the majority's third holding fails to focus the undue burden analysis on the unique circumstances of a case—which here means a case in which dozens of correctional officers would be needed to accommodate the plaintiffs in all programs, even if one officer would reasonably accommodate them in one.[34]

## A. "Significant Risk," Not "High Odds"

Section 504 of the Rehabilitation Act of 1973,[35] under which the plaintiffs seek relief, requires a federal-fund grantee reasonably to accommodate a disability only if the disabled person is "otherwise qualified" for the activity.[36] As the Supreme Court interpreted the statute in *School Board v. Arline,*[37] the "basic factors" for determining if the carrier of a contagious disease is otherwise qualified include

> [findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the

---

[34]One further holding from which I dissent requires only brief explanation. The plaintiffs claim that the district court erroneously refused to consider programs such as work release and boot camp that required residential integration of the plaintiffs into the general population at other facilities. The majority notes correctly that the plaintiffs waived all claims for residential integration by not challenging on appeal the trial court's refusal to consider the issue of integration. Because the plaintiffs have abandoned on appeal any claim for residential integration, this court should not direct the district court—in effect end-running the waiver—to consider all programs requiring residential integration. The court should instead, in light of the waiver, uphold the district court's refusal to consider those programs.

[35]Codified as amended at 29 U.S.C. § 794 (1994).

[36]*Harris v. Thigpen*, 941 F.2d 1495, 1522 (11th Cir.1991).

[37]480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987).

potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.[38]

The Court further directed the courts to "defer to the reasonable medical judgments of public health officials."[39] The point, as the Court put it, is that "[a] person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk."[40]

Contrary to the majority's holding, this standard does not seek simply to identify a certain percentage possibility of transmission above which the plaintiff is not otherwise qualified. *Arline*'s selection of factors and its language show that the significance of a risk is a product of the odds that transmission will occur and the severity of the consequences. First, *Arline*'s four factors include both "the severity of the risk" and the "the probabilities the disease will be transmitted," not just "the odds the virus will spread." This suggests that each must interplay with the other in the otherwise-qualified inquiry. Second, significance by itself connotes more than size: "significant" means "deserving to be considered," "important," "weighty," or "notable."[41] It does not just mean "big."[42] And it is the potential gravity of the harm that imbues certain odds of an event with significance. This is indeed common sense: to borrow an analogy from the district court's opinion, we are far more likely to consider walking a tightrope to pose a significant risk if the rope is fifty feet high than if it is one foot off the ground. This is so even if the odds of losing our balance are the same however far we have to fall.

In the context of HIV transmission, *Arline*'s standard thus means that something less than high odds of transmission will make the plaintiffs not otherwise qualified. It has been

---

[38]*Id.* at 288, 107 S.Ct. at 1131 (quoting Br. for American Med. Ass'n as Amicus Curiae at 19).

[39]*Id.*

[40]*Id.* at 287 n. 16, 107 S.Ct. at 1131 n. 16.

[41]Webster's Third International Dictionary 2116 (1986).

[42]*See id.*

uncontroverted at every stage of this case that HIV is inevitably, and painfully, fatal. These horrendous consequences render even very low odds of transmission enough to make a risk significant. The other circuits that have confronted this issue directly have indeed so interpreted *Arline*'s standard. The Fourth Circuit has affirmed a district court's conclusion that an HIV-positive neurosurgery resident could be barred from surgery, notwithstanding the fact that there were no documented cases of surgeon-to-patient HIV transmittal.[43] Similarly, the Fifth Circuit has held that a "small" chance of blood-to-blood contact between an HIV-positive surgical assistant and his patients nonetheless constitutes a "significant" risk: "A cognizable risk of permanent duration with lethal consequences suffices" to disqualify the assistant.[44]

Based on *Arline*'s standard thus interpreted, the district court's conclusion was correct. First, the district court finding of a cognizable possibility of transmission has record support. The court found as fact the following: that blood-to-blood contact likely transmits HIV; that violence, intravenous drug use, and sex may cause blood contact and occur in prisons in the most unlikely and unexpected places; and that it is impossible to know or surveil much of what goes on. These subsidiary findings, which are supported by expert and lay testimony, legitimately support the conclusion that mixing prisoners raises a cognizable possibility of spreading HIV. "Conjecture," as

---

[43]*Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1266 (4th Cir.1995). The court noted that the Centers for Disease Control estimate the risk of transmission from an HIV-positive surgeon to a single patient to be between one in 42,000 and one in 417,000. *Id.* at 1263.

[44]*Bradley v. University of Tex. M.D. Anderson Cancer Ctr.*, 3 F.3d 922, 924 (5th Cir.1993); *cf. Kohl v. Woodhaven Learning Ctr.*, 865 F.2d 930, 941 (8th Cir.1989) (concluding that a hepatitis B carrier posed a significant risk, because even though the risk of transmission to those treated immediately after blood-to-blood contact is 2.5%, 1% of those infected would eventually die from the disease). This circuit's law is not to the contrary. *Martinez v. School Board*, 861 F.2d 1502, 1506 (11th Cir.1988), which the majority cites as requiring a high probability of transmission to render a plaintiff not otherwise qualified, is distinguishable. Unlike here, the district court in that action did not even consider certain transmission risks, such as through blood. Instead, the district court found that there was a "remote theoretical possibility" of transmission through other bodily fluids and ended the inquiry there. *Id.* This court held that the risks of transmission through tears, saliva, and urine in the case's classroom setting did not reach a significant level of risk, but the court remanded for further findings as to the possibility of blood transmission. *Id.* Here, of course, the district court based its finding of significant risk on all possible transmission methods.

41

the majority calls it, it may be, but the district court has no other option in this case. After all, *Arline*'s standard requires the court to measure risk. Measuring risk is predicting the future. Unless the judge is a seer, he must predict the future by drawing inferences from both current conditions and past events. It may be preferable to extrapolate past events, but in this case that would, in effect, impose a somebody-has-to-die-first standard—the risk is not cognizable until someone dies from the conditions posing the risk. This court should reject such a standard.

Next, the district court properly concluded that this risk was significant. *Arline*'s sliding-scale standard authorized the court to cleave to caution and find the risk significant in a case such as this when death is a certain result of the possible event. The district court's conclusion also comported with *Arline* in another significant respect: *Arline* urges circumspection when a finding may contravene the judgment of public health professionals.[45] Prison officials charged with protecting prisoners' health have determined that this policy is justified, and the court properly hesitated before rejecting their judgment. The district court's conclusion that the plaintiffs' participation in the programs poses a significant risk to others' health, and that the plaintiffs thus are not otherwise qualified, should be upheld.

### B. Security Matters

In its otherwise-qualified inquiry, the district court also reviewed the four factors suggested in *Turner v. Safley*[46] to determine whether the defendants' security concerns disqualified the plaintiffs from participating in the programs.[47] The trial court concluded that the likelihood of inmate resentment and fear of the HIV-positive prisoners made violence a reasonable worry, and that the wardens were therefore justified in separating the HIV-positive prisoners from the HIV-negative.

---

[45]*Arline,* 480 U.S. at 288, 107 S.Ct. at 1131.

[46]482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

[47]For one program, interstate prisoner exchange, the district court pretermitted the rest of its otherwise-qualified analysis and concluded that legitimate penological concerns alone warranted the plaintiff's exclusion. Op. at 269-73.

*Turner* is not a Rehabilitation Act case, and the propriety of using its factors in considering a § 504 plaintiff's qualifications is new to this court.

I must first dispose of a threshold matter: the prior panel's silence on this issue is not law of the case. The law-of-the-case doctrine "comes into play only with respect to issues previously determined."[48] An appeals court may impliedly resolve an issue.[49] But for that resolution to govern all subsequent proceedings, the issue must *necessarily* have been decided.[50] The doctrine does not embrace all issues that could have been addressed,[51] even if addressing them would have been appropriate.[52]

An implied holding is at best what we have from the first panel's opinion, which is silent on *Turner*'s application. And we should not infer any holding at all on *Turner* from the panel's silence. After all, the issue was not before the court. Following the first trial, the district court denied the plaintiffs relief on their Rehabilitation Act claim on the finding that the plaintiffs were not otherwise qualified because "the probability of transmission, in the prison environment, is significant" in all programs, without an individuated assessment.[53] The plaintiffs challenged this conclusion on one

[48]*Quern v. Jordan*, 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979); *accord, Burger King Corp. v. Pilgrim's Pride Corp.*, 15 F.3d 166, 168 (11th Cir.1994); *Hester v. International Union of Operating Eng'rs*, 941 F.2d 1574, 1581 n. 9 (11th Cir.1991).

[49]*Burger King,* 15 F.3d at 168.

[50]*See Wheeler v. City of Pleasant Grove*, 746 F.2d 1437, 1440 (11th Cir.1984) ("[T]he law is clear that [the doctrine] comprehends things decided by *necessary* implication as well as those decided explicitly.") (emphasis added) (internal quotations omitted).

[51]18 Charles Alan Wright et al., Federal Practice and Procedure § 4478, at 789 (1981).

[52]*See Lawson v. Singletary*, 85 F.3d 502, 512-13 (11th Cir.1996) (law-of-the-case doctrine did not apply, in part because the issue at hand—the constitutionality of prison regulations—was not briefed in the earlier appeal, which concerned the appropriate standard of constitutional review); *Northeastern Fla. Chapter of Associated Gen. Contractors of America v. City of Jacksonville*, 951 F.2d 1217, 1218 n. 1 (11th Cir.1992) (first panel vacated a preliminary injunction solely because of an insufficiently developed record, despite a special concurrence pointing out—sua sponte—that the plaintiff lacked standing; second panel nonetheless was entitled to affirm a denial of relief based on its *independent* conclusion that the plaintiffs lacked standing), *rev'd on other grounds,* 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993).

[53]*Harris v. Thigpen*, 727 F.Supp. 1564, 1582 (M.D.Ala.1990).

ground: that the district court could not have found the plaintiffs to be not otherwise qualified without individualized findings as to the risk of transmission in every program for every member of the class.[54] Thus, because the Rehabilitation Act *Turner* issue was not raised in the briefs, the panel may have decided not to address an issue that was not properly presented. Many panels so decide.[55] Furthermore, whether *Turner*'s factors may weigh into otherwise-qualified analysis was not an issue the court had to resolve before holding that the Rehabilitation Act requires a program-by-program qualifications assessment. There is, therefore, no law of the case relating to this issue.

The issue is accordingly now before this court. This court should hold, as the Ninth Circuit has,[56] that *Turner*'s factors are relevant to Rehabilitation Act claims arising in prison. Four reasons support this conclusion. *First, Turner*'s concerns apply equally to statutory claims even though *Turner*'s holding is limited to constitutional claims. In either case, federal judges have no business sitting in the warden's seat:

> [T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.... Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in *Martinez* [*Procunier v.,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) ], additional reason to accord deference to the appropriate prison authorities.[57]

---

[54]Appellants' Br., Harris v. Thigpen, Nos. 90-7083, 90-7100, at 42-50.

[55]*See, e.g., United States v. Dieguimde*, 119 F.3d 933, 934-35 (11th Cir.1997) (declining to address poorly briefed and possibly moot issue); *Alabama Power Co. v. OSHA*, 89 F.3d 740, 747 n. 7 (11th Cir.1996) (refusing to address issue not raised in trial court); *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 237 n. 6 (11th Cir.1995) (declining to address issue raised only in reply brief).

[56]*See Gates v. Rowland*, 39 F.3d 1439, 1447 (9th Cir.1994).

[57]*Turner v. Safley*, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987) (citation omitted).

These concerns are equally valid for both constitutional and statutory claims. In both cases, the judges run into the same problems of lack of experience and expertise when they begin to interfere with matters traditionally left to the legislative and executive branches. Here, moreover, Congress's enactment of the statute does not put a legislative stamp of approval on judicial intrusion into state prison administration. Congress apparently never thought about prisons when it passed the Rehabilitation Act. The words "prison" and "prisoner" do not occur in the legislative history. Section 504 does not mention prisons. In short, "[t]here is no indication that Congress intended the Act to apply to prison facilities irrespective of the considerations of the reasonable requirements of effective prison administration."[58]

*Second,* federal judicial second-guessing of the legitimate penological decisions of state authorities, even when statutorily prompted, runs squarely counter to the most basic notions of comity. Prison administration is a core state function.[59] "It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons."[60] In this realm, federal courts should await a clear statement from Congress before construing statutes as a license to dictate state policy.[61] Taking the Rehabilitation Act's silence as to application in the prison environment to mean that its effect in prison is identical to that elsewhere does not comport with this "clear statement" rule. On the other hand, viewing § 504's "otherwise qualified" language as incorporating *Turner* 's

---

[58]*Gates,* 39 F.3d at 1447.

[59]*Torcasio v. Murray*, 57 F.3d 1340, 1345 (4th Cir.1995), *cert. denied sub nom. Torcasio v. Angelone*, --- U.S. ----, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996).

[60]*Preiser v. Rodriguez*, 411 U.S. 475, 491-92, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973).

[61]*Torcasio,* 57 F.3d at 1345 (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989); *United States v. Bass*, 404 U.S. 336, 349-50, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971)). The Fourth Circuit has indeed held that the Rehabilitation Act does not apply to state prisons *at all* because of the Act's lack of an appropriate "clear statement." *Amos v. Maryland Dep't of Pub. Safety & Correctional Servs.*, 7 A.D. Cases 454 (4th Cir.1997). While the applicability of the Rehabilitation Act to state prisons is law of the case for this panel, the issue may merit en banc attention.

45

factors, which carry an element of deference to prison authorities, provides a means of avoiding undue interference in state affairs without a clear congressional direction.

*Third, Arline* 's standard, born in an action by a teacher plaintiff, is inadequate for the prison setting. While *Arline* acknowledges that the Rehabilitation Act does not require the federal-fund grantee, or its wards, to run significant risks of any kind,[62] its rule views those risks as solely ones to health *from the disease.* In a classroom setting, or in the surgical theater,[63] these risks may be the only dangers that the communicable disease poses. But in prison, mixing carriers of a virus that is considered loathsome, however wrongly, with those who do not have the virus runs the risk of violence. The district court so found, and cases elsewhere show that such violence is not unknown.[64] This danger—whether or not it leads to HIV transmission—warrants consideration along with health risks, and *Turner* 's factors offer a vehicle for taking into account hazards that are unique to the prison context.

*Fourth,* considering *Turner* 's factors in a prison Rehabilitation Act case is wholly consistent with the statute. As *Arline* 's holding makes clear, § 504 does not command the federal-fund grantee to endanger its wards.[65] And in the employment context from which *Arline* sprang, Congress has embraced the principle of safety-threat limitations. This concern for safety enters into § 504 by way

---

[62]*Arline,* 480 U.S. at 287, 107 S.Ct. at 1130-31 (describing the inquiry under its standard as "essential if § 504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and *safety* risks") (emphasis added).

[63]*See Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1266 (4th Cir.1995); *Bradley v. University of Tex. M.D. Anderson Cancer Ctr.*, 3 F.3d 922, 924 (5th Cir.1993).

[64]*Anderson v. Romero*, 72 F.3d 518, 520 (7th Cir.1995) (claim by HIV-positive inmates against prison authorities for disclosing his HIV-positive status and thus exposing him to attacks by other prisoners); *Casey v. Lewis*, 4 F.3d 1516, 1524 (9th Cir.1993) ("[W]henever inmates discover another inmate is HIV-positive ... threats are made against that inmate's life."), *rev'd on other grounds,* --- U.S. ----, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Adams v. Drew*, 906 F.Supp. 1050, 1058 (E.D.Va.1995) (plaintiff inmate assaulted by other inmates solely because of his HIV positive status).

[65]*Arline,* 480 U.S. at 287, 107 S.Ct. at 1131.

of § 504(d), which imports the standards under Title I of the American with Disabilities Act (ADA) into § 504 in employment cases.[66]  Section 103(b) of the ADA,[67] as interpreted, in turn permits discrimination against those who as a result of their disability pose a "direct threat to the health or safety of other individuals in the workplace."[68]  It would be anomalous to hold that although an authority may take safety of either the Rehabilitation Act plaintiff or his coworkers into account in taking adverse employment action against that plaintiff, a prison is not entitled to respect for its concern for protecting the safety of the plaintiffs here and their fellow inmates.  *Turner* 's factors offer a means to implement these safety limitations in the prison setting.

For these reasons, the district court did not err in taking into account the defendants' security concerns that lead to segregating the HIV-positive prisoners in the programs at issue.  Nor did the district court err in its analysis of *Turner* 's factors.[69]  A key fact-finding, which was adequately based on survey evidence and the presence of an intervenor inmate class that opposes integration of the programs, is that there are still many inmates who would react negatively—indeed, violently—to integration.  Application of *Turner* 's four factors to this case's circumstances in light of this fact supports the district court's conclusion that security concerns disqualify the plaintiffs.  First, security is a classically legitimate penological concern, and the court could conclude that separating prisoners who, if mixed, would react violently, has a rational connection to preventing violence.  This factor weighs against the plaintiffs.  *Turner* 's second factor weighs in the plaintiffs' favor:  they have no other way of participating in integrated programs.  The third factor, however, weighs heavily against the plaintiffs;  the district court could properly conclude, based on sufficient evidence of inmate prejudice, that mixing HIV-positive and HIV-negative inmates could cause ripple effects that threatened security, either because of anti-HIV prejudice or as a result of the

---

[66]29 U.S.C. § 794(d) (1994).

[67]Codified at 42 U.S.C. § 12113(b) (1994).

[68]*Id.*;  *see E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir.1997).

[69]*See Turner,* 482 U.S. at 89-90, 107 S.Ct. at 2262 (naming the four factors in its test).

47

necessary diversion of resources from elsewhere to surveil the integrated programs.  Finally, the court properly concluded that there are no "obvious, easy alternatives" here:  plaintiffs' implication that integration is an easy alternative because other prison facilities follow it does not undermine the court's conclusion.  Given its findings concerning the substantially higher seroconversion rates and incidence of violence elsewhere, the court could properly find that integration elsewhere served the interests of security and health less reasonably than the policies under attack here.  Thus, the district court's otherwise-qualified findings should be upheld.

### C. Isolated Versus Global Burden of Accommodation

The Rehabilitation Act deems a disabled person qualified to participate in an activity if reasonable accommodations remove any disqualification.[70]   One of the plaintiffs' primary reasonable-accommodation suggestions was the hiring of more guards to provide the surveillance necessary to prevent the plaintiffs and HIV-negative inmates from engaging in high-risk behavior. The district court found that the plaintiffs' recommended level of security staffing would not prevent high-risk behavior, but implied that the Department of Corrections' claimed necessary level of staffing—60 additional guards all together—would adequately reduce the risk.[71]  This level of staffing, the court concluded, would place an undue financial and administrative burden on the already-strapped prison system.[72]   This conclusion was based on the effect system-wide of accommodating the plaintiffs in all the programs at issue:  the court emphasized that it would "see "the forest as well as the individual trees.' "[73]  The plaintiffs claim that the district court erred either by failing to consider the burden in each program separately or, alternatively, by failing to pick particular programs to which limited resources should be allocated.[74]  The plaintiffs suggest that the

---

[70]*Harris v. Thigpen,* 941 F.2d 1495, 1525 (11th Cir.1991).

[71]Op. at 51-53.

[72]*Id.* at 53.

[73]*Id.* at 51.

[74]Appellants' Br. at 41-42.

court should have compared the cost of each individual guard to the Department of Corrections' entire budget to determine if each guard alone would be a reasonable accommodation.

The district court did not err. Whether an accommodation imposes an undue burden on a defendant is determined by "the hardships imposed by the plaintiff's preferred accommodation *in the context of the particular agency's operations.*"[75] And cost is a hardship properly taken into account in assessing whether the burden on a federal-fund grantee is undue.[76] Assessing that cost accommodation-by-accommodation, and not in the aggregate, effectively defeats the purpose of the agency-specific analysis: it permits impositions of burdens that could nickel-and-dime an agency to extinction. That reasoning ignores, rather than examines, the "context of the particular agency's operations." Thus, if the plaintiffs demand to be accommodated system-wide, the total cost to the Department of Corrections is the relevant cost for determining the agency's burden. Adding 60 guards at Tutwiler and Limestone, as the record suggests are needed to ensure security, would require a nearly 20% increase in guard staffing.[77] The district court could conclude based on this record that accommodation by an increase in staffing would place an undue hardship on the Department of Corrections.

The plaintiffs further fault the district court for not considering whether the Department of Corrections in fact needed all the guards it currently has stationed where they are currently stationed, and for not choosing certain programs for integration if it is indeed true that providing all the guards necessary would be an undue burden. The plaintiffs cite no evidence in the record, however, that indicates that any guards elsewhere are unnecessary. To the contrary, the record suggests that both

---

[75]*Willis v. Conopco, Inc.*, 108 F.3d 282, 286 n. 2 (11th Cir.1997) (emphasis added) (quoting *Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C.Cir.1993)).

[76]*See, e.g., Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 138 (2d Cir.1995); *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 543 (7th Cir.1995) (both identifying undue hardship analysis as a species of cost-benefit inquiry).

[77]The record suggests, moreover, that the additional staffing would be more expensive. To get guards for the HIV unit, Limestone must currently pay those guards more. R.32 at 110.

Tutwiler and Limestone are already staffed significantly below the optimum.[78] Nor do the plaintiffs propose a basis upon which the district court should have allocated any portion of the necessary additional guards. The plaintiffs thus failed to carry their burden of proof that alternate, less burdensome reasonable accommodations exist by moving correctional officers from other posts to HIV-protection posts. The district court's conclusion should accordingly be upheld.

### D. Reassignment to Another District Judge

The plaintiffs in this case sought Judge Varner's recusal on a variety of grounds. Judge Varner refused to recuse himself, and the plaintiffs appeal the denial of their motion and suggest, in the alternative, that the case be assigned on remand to another judge. Among the reasons for this remedy they point to Judge Varner's remarks on the bench and in his opinion, the judge's law clerk's father-son relationship to the defendants' lead counsel, and the judge's possible learning of facts pertinent to the medical issues in this case from the judge's son, a physician. The majority properly concludes that the record does not sufficiently evince bias or impropriety that required Judge Varner to recuse himself under the Supreme Court's interpretation of 28 U.S.C. § 455.[79] But the majority then adopts a "middle course"—reassigning the action—that leaves Judge Varner stained with impropriety's brush. This "middle course" is extreme and unnecessary in this case.

Reassignment is rare in this circuit and is generally appropriate only when three factors weigh in favor of it: (1) whether the original judge would have had difficulty putting his previous views and findings aside; (2) whether reassignment is appropriate to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication out of proportion to the gains realized from reassignment.[80] None of these factors points to reassignment in this case.

---

[78]Warden Lobmiller of Tutwiler requested 179 guards in 1993 and was authorized to employ 90. R.35 at 13-14. The Limestone facility is approximately forty guards short of full staffing. R.32 at 106.

[79]*Liteky v. United States*, 510 U.S. 540, 554-56, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994).

[80]*Torkington,* 874 F.2d at 1446.

The first prong is satisfied only by a showing of extreme conduct—for example, when a judge has willfully refused to follow this court's mandate,[81] or when the judge has made such mistakes that in the court of appeals' eyes the court appears unjust.[82] Judge Varner's greatest offense, however, is that he disagreed with the plaintiffs. Far from ignoring this court's mandate, his 475-page opinion meticulously reviews the individual evidence about the location, circumstances, and security concerns for dozens and dozens of separate programs. Nor is the appearance of justice imperiled here. As the majority observes, Judge Varner's remarks do not show any bias mandating recusal,[83] and the evidence of impropriety is also insufficient to warrant recusal. This court should on this record be as hesitant to direct reassignment as it is to find recusal to be mandated. Finally, the extraordinary waste of judicial resources that would result on remand if we shift judges after ten years of litigation and two trials counsels leaving the case before Judge Varner. I would therefore refuse to direct reassignment to another district judge.

## III. Conclusion

For the foregoing reasons, I would vacate the district court's judgment and remand for the limited purpose of permitting the district court to reconsider, in light of plaintiffs' and defendants' evidence of prisoner classification, whether classification offers the basis for a reasonable

---

[81]*See, e.g., United States v. Remillong*, 55 F.3d 572, 577 (11th Cir.1995) (reassigning case after the district judge "stubbornly persisted" in disregard of this court's mandate); *Clark v. Coats & Clark*, 990 F.2d 1217, 1230 (11th Cir.1993) (reassigning case when the district judge's opinion "contained strong language expressing dissatisfaction with this court's decision").

[82]*See, e.g., Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353 (11th Cir.1997) (reassigning case from district judge that had refused to rule on a motion to dismiss, ignored discovery objections, adopted one party's exaggerated statements verbatim, and precipitously imposed a default sanction on the defendant for inadequately complying with an unintelligible discovery order drafted by opposing counsel and signed by the judge).

[83]*Compare United States v. Microsoft, Inc.*, 56 F.3d 1448, 1463-64 (D.C.Cir.1995) (judge rejected consent decree without modifications that would address conduct accused by a bestseller that the judge had read, but not mentioned in the complaint; judge also permitted intervenors and amici to proceed anonymously because of his bestseller-induced suspicion of Microsoft); *Torkington,* 874 F.2d at 1447 (judge grants judgment of acquittal early in prosecution case, which the judge called a waste of taxpayer money, based upon a prosecution witness's unelicited remark that violated a motion in limine).

accommodation of the plaintiffs' disability.  I would otherwise affirm the district court's resolution

of the issues presented on appeal.